761 P.2d 855

**In re Application of the BURLINGTON NORTHERN RAILROAD COMPANY to Close the Agency Station at Des Moines, New Mexico.**

**BURLINGTON NORTHERN RAILROAD COMPANY, Appellant,**

v.

**CORPORATION COMMISSION, Appellee.**

No. 17482.

Supreme Court of New Mexico.

Sept. 15, 1988.

Oman, Gentry & Yntema, P.A., Nicholas R. Gentry, Albuquerque, for appellant.

Hal Stratton, Atty. Gen., Joseph van R. Clarke, D.L. Sanders, Asst. Attys. Gen., Santa Fe, for appellee.

OPINION

RANSOM, Justice.

The New Mexico State Corporation Commission (Commission) denied the application of Burlington Northern Railroad Company (Burlington) to close its agency station located at Des Moines, New Mexico. Burlington has removed the cause for review by this Court pursuant to Article XI, Section 7 of the New Mexico Constitution.[1]

1. Article XI, Section 7 of the New Mexico Constitution provides in pertinent part as follows:

The commission shall have power * * * to require railway companies to provide and maintain ... agents and facilities * * * for receiving and delivering freight and express * * * whenever in the judgment of the commission the public interests demand, and as may be reasonable and just. * * * The commission shall have power * * * upon a hearing, to determine and decide any question given to it herein * * *. Any company, corporation or common carrier which does not comply with the order of the commission within the time limited therefor, may file with the commission a petition to remove such cause to the supreme court * * *.

[T]he said court shall have the power and it shall be its duty to decide such cases on their merits....

We hold that the Commission's order was reasonable and just and will be enforced.

Following an application from Burlington seeking permission to close its agency station at Des Moines, the Commission held a public hearing in Raton, New Mexico, on September 5, 1986. At that hearing, Burlington presented its evidence in support of discontinuing a base agency service at Des Moines. No formal intervenor protested against the application. However, members of the public, including a state senator, the mayor of Des Moines, and a representative of Twin Mountain Rock, a major Burlington customer, expressed opposition to the closing. In addition, the Commission received and incorporated into the record letters of protest offered by Twin Mountain and members of the Eastern Plains Council of Governments.

The Burlington agency station at Des Moines is currently staffed by one local agent, Ted Kirkendall, who is on duty forty hours per week. Kirkendall's duties include communicating with customers, collecting revenue, preparing inbound waybills and furnishing the Denver office with information for the outbound waybills, monitoring the station grounds, and correctly spotting railroad cars. Burlington proposes to eliminate Kirkendall's position and handle all his duties from its Denver office. The Denver agency is staffed with approximately sixty-five employees, is open twenty-four hours a day, seven days a week, and maintains a system-wide computer facility. Burlington's customers in Union County who wish to order cars, release loaded cars, or obtain information on shipping rates, schedules, freight charges, etc., may choose either to call Denver toll free or to deal with Kirkendall in Des Moines, who must then relay the matter to the

Denver facility where it is handled by computer.

Additionally, Kirkendall performs certain safety functions. He visually inspects trains as they roll by to detect equipment malfunctions or other unsafe conditions. In the event of a derailment or other railroad emergency, Kirkendall serves as a relay point for information between local firefighters, Burlington's wrecking and safety crews, and the Amarillo, Texas, company under contract to Burlington to handle major derailments and the clean-up of hazardous spillage.

Burlington's three major customers are Twin Mountain, Big Chief Stone, and Kaiser Coal. The revenues for the years 1983 through the first half of 1986 attributable to Des Moines and its assigned blind sidings, where no agent is present, were as follows: $465,000 in 1983; $510,711 in 1984; $478,695 in 1985; and $301,621 for the first half of 1986. A station in the Burlington system must have approximately $400,000 in annual revenue to break even for the year. The total expense for the Des Moines station, which included a percentage of the entire system's operating costs, the wages and benefits of Kirkendall and two relief workers, and station maintenance costs, was as follows: $42,708 in 1983; $44,988 in 1984; $44,864 in 1985; and $56,906 in the first half of 1986. Over ninety-five percent of the total annual expense is attributable to wages and fringe benefits.

■ Under Article XI, Section 7 of our constitution, this Court is mandated to decide a case such as this one on its merits. Our scrutiny, therefore, is more exacting than that normally accorded administrative decision-making.[2] In reviewing a Commis-

---

2. Traditionally, the court reviewed administrative action to determine whether it was supported by substantial evidence. *See Duke City Lumber Co. v. New Mexico Envtl. Improvement Bd.*, 101 N.M. 291, 681 P.2d 717 (1984). The deference afforded agency action was such that the court would consider only evidence favorable to the agency and would ignore evidence to the contrary. *Id.* at 293, 681 P.2d at 719. This minimal judicial intrusion represented by a substantial evidence standard of review has been supplanted now by whole record review in the

normal appeal of administrative decision-making. *See id.; National Council on Compensation Ins. v. New Mexico State Corp. Comm'n*, 107 N.M. 278, 756 P.2d 558 (1988). Under whole record review, to conclude that an administrative decision is supported by substantial evidence, the reviewing court needs to find evidence that is credible in light of the whole record. "No part of the evidence may be exclusively relied upon if it would be unreasonable to

sion order on its merits, instead of examining evidence to substantiate the Commission's findings, we make an independent determination that it is more likely than not that the Commission's order is just and reasonable. *Missouri Pac. R.R. v. State Corp. Comm'n,* 93 N.M. 753, 754, 605 P.2d 1152, 1153 (1980). The Commission's order may be affirmed only "if supported by 'satisfactory and substantial evidence.' The term 'satisfactory' implies a weighing procedure." *Atchison, T & S.F. Ry. v. Corporation Comm'n,* 99 N.M. 205, 207, 656 P.2d 868, 870 (1982) (quoting *Mountain States Tel. & Tel. Co. v. Corporation Comm'n,* 99 N.M. 1, 6, 653 P.2d 501, 506 (1982)). This is not, however, a de novo review of the record where we substitute our judgment for that of the Commission. *Seward v. Denver & Rio Grande R.R.,* 17 N.M. 557, 578–80, 131 P. 980, 987–88 (1913); *but see Village and Citizens of Grenville v. State Corp. Comm'n,* 53 N.M. 259, 260, 206 P.2d 259, 260 (1949) ("[T]he cause has been removed for trial de novo provided by Sec. 7 of Art. 11 of this state's Constitution."). It is simply that we do not indulge in any presumptions in favor of the agency decision, *Mountain States Tel. & Tel. Co.,* 99 N.M. at 6, 653 P.2d at 506; but while the Commission's findings are not binding upon this Court, *State v. Mountain States Tel. & Tel. Co.,* 54 N.M. 315, 323, 224 P.2d 155, 161 (1950), it is an overstatement to imply that such findings are ignored in the weighing process. We recognize the expertise of the Commission in public utility management.

■ In determining the reasonableness of an order concerning the removal of local station agents, this Court engages in a cost-benefit analysis, balancing the convenience to the shipper and the benefit to the public in maintaining the agent, compared to the potential economic waste to the railroad of having to maintain an agent. *Missouri Pac. R.R.,* 93 N.M. at 755, 605 P.2d at 1154. Factors to be considered in this analysis are the expense of maintaining the station, the revenue derived by the railroad from the operation of the station, the num-

ber of people to be benefited, the demand for services, the proximity and accessability of other stations, any inconvenience to the public, the nature of the service remaining or to be substituted, and all other facts and circumstances. *Id.; Atchison, T. & S.F. Ry.,* 99 N.M. at 208, 656 P.2d at 871.

As a preliminary matter, we note that before utilizing this balancing test previous courts first would make clear whether safety was in issue. *Seward,* 17 N.M. at 594, 131 P. at 993 (where safety is questioned, there is involved a different proposition than the interests of the public and the expense entailed upon the railroad company); *Randall v. Atchison, T. & S.F. Ry.,* 34 N.M. 391, 392, 281 P. 479, 480 (1929) ("No question of the need of an agent * * * for public safety is involved * * *."); *Denton Bros. v. Atchison T. & S.F. Ry.,* 34 N.M. 53, 54, 277 P. 34, 35 (1929) ("The public safety is not involved. It is a matter of public convenience only."); *Southern Pac. Co. v. State Corp. Comm'n,* 76 N.M. 257, 259, 414 P.2d 489, 490 (1966) ("It is not contended that an agent at the station is required for public safety."); *Missouri Pac. R.R. v. State Corp. Comm'n,* 93 N.M. 753, 605 P.2d 1152 (1980) (no issue of public safety to consider in setting aside Commission's order denying discontinuation of mobile agent at Hobbs, N.M.).

Having made this observation, we do not submit that where safety is at issue we should depart entirely from a balancing of the respective interests of the public and the railroad, provided the activity at issue is not unreasonably dangerous. When legitimate public safety concerns are implicated, however, evidence that the railroad will experience some economic detriment in maintaining an agent will be insufficient to weigh against the reasonableness of an order denying the elimination of that agent. *See Railroad Comm'n v. Eastern Texas R.R.,* 264 U.S. 79, 85, 44 S.Ct. 247, 249, 68 L.Ed. 569 (1924) ("[T]he State has power to regulate [a railroad's] operations in the interest of the public, and to that end may require it to provide reasonably safe and adequate facilities for servicing the

do so." *National Council of Compensation Ins.,*

107 N.M. at 282, 756 P.2d at 562.

public, even though compliance be attended by some pecuniary disadvantage.").

During the hearing, three safety concerns were raised: right-of-way fires, hazardous materials spillages, and the elimination of Kirkendall's performance of roll-by inspections. Burlington argues that Kirkendall simply is not involved in either extinguishing right-of-way fires or dealing with hazardous spillages. Further, Burlington maintains that the absence of Kirkendall's visual inspection of passing trains will have no adverse safety ramifications. This function is performed by nearly all of Burlington's employees, as required by its safety rules. Also, Burlington has installed warning devices on the track that mechanically detect problems on moving trains.

Admittedly, Kirkendall has no role in the actual extinguishment of a fire or in the actual clean-up of a hazardous spillage. Kirkendall, however, would be instrumental in assembling the initial response team, the volunteer fire department, and would be involved in coordinating the various entities responding to an emergency. Furthermore, we would be reluctant to discount the importance of Kirkendall's roll-by inspections. *See Atchison*, 99 N.M. at 208, 656 P.2d at 871.

In weighing the order's impact upon the railroad's interest, Burlington concedes that because of present contractual obligations it will not be able to reduce significantly current expenditures if it were to close the Des Moines agency. Nor do the expenses represent significant economic waste. Burlington's inability to discontinue personal customer service at Des Moines, however, impedes it from centralizing operations at its system-wide computerized facility at Denver. In addition to the Des Moines station, at the time of the hearing, Burlington was also seeking to close stations in Texline, Texas, and Trinidad, Colorado, leaving the 450 mile stretch between Denver and Amarillo without local agencies. Burlington needs to streamline and to eliminate duplicative services to remain competitive in the marketplace.

Furthermore, elimination of a local agent would not result in any appreciable degradation in the quality of customer service. Burlington's witness testified that in other sections of its system customers relying on regional computerized centers experienced no problems with Burlington's delivery of service. Those opposing the agency closing opined that the quality of service might suffer if the local agent was removed. There was nothing to substantiate these speculative apprehensions. In fact, Burlington attempted to assuage the fears of Twin Mountain by arranging for Twin Mountain's computer to interface directly with Burlington's in Denver. Moreover, Kirkendall is available only forty hours a week whereas Denver is accessible toll-free, seven days a week, twenty-four hours a day. The evidence was abundant to demonstrate the public would benefit, rather than be inconvenienced, by the elimination of customer services at Des Moines.

Notwithstanding the absence of significant short-term savings to Burlington in closing the Des Moines agency, if the only issue were the convenience of the public, we would have to conclude that the evidence weighs against the reasonableness of requiring the agency to remain open. However, legitimate public safety concerns have been raised. *See Atchison*, 99 N.M. at 208, 656 P.2d at 871 (placing into the balance the safety of the travelling public). Burlington's plan to supplant Kirkendall with direct communications with Denver does not address the loss of the safety functions currently executed by him. Burlington contends that Kirkendall's place in the communications loop during an emergency can be fullfilled by either calling Denver or Ft. Worth. Burlington's trainmaster, who resides in Trinidad, Colorado, stated that he could be in Des Moines in an hour to an hour and one half to relay information to entities responding to an emergency.

In an emergency, time is of the essence. Because of Kirkendall's ties to the community, he has the ability to contact

quickly members of the Des Moines volunteer fire department. The evidence preponderates that, under the present system, the removal of Kirkendall could compromise public safety. Burlington did not produce sufficient evidence to allay the legitimate safety concerns of the community and the Commission. We find the Commission's denial of Burlington's application to close its agency station at Des Moines reasonable and just. The order will be enforced.

IT IS SO ORDERED.

SCARBOROUGH, C.J., and WALTERS, J., concur.